1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                  PORTLAND DIVISION

4

5   UNITED STATES OF AMERICA,        )
                                     )
6                    Plaintiff,      )   No. 3:18-cr-00319-JO-4
                                     )
7           vs.                      )   February 14, 2019
                                     )
8   KENNETH EARL HAUSE,              )   Portland, Oregon
                                     )
9   _____Defendant.____)

10

11

12

13              TRANSCRIPT OF PROCEEDINGS

14                 (Review of Detention)

15

16        BEFORE THE HONORABLE ROBERT E. JONES

17      UNITED STATES DISTRICT COURT SENIOR JUDGE

18

19

20

21

22

23  Court Reporter:          Ryan White, RMR, CRR, CSR/CCR
                             United States District Courthouse
24                           1000 SW 3rd Avenue, Room 301
                             Portland, Oregon 97204
25                           (503) 326-8184

1                              APPEARANCES

2

3    For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
                               By:   STEVEN T. MYGRANT
4                              steven.mygrant@usdoj.gov
                               REBECCA A. STATON
5                              rebecca.staton@usdoj.gov
                               1000 SW 3rd Avenue, Suite 600
6                              Portland, Oregon 97204
                               (503) 727-1052
7

8    For the Defendant:        TODD E. BOFFERDING
                               Attorney at Law
9                              tbofferding@gorge.net
                               Post Office Box 539
10                             Hood River, Oregon 97031
                               (541) 490-9012
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (February 14, 2019; 11:30 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  Good morning, everybody.  Have a seat.

6          MR. BOFFERDING:  Good morning, Your Honor.

7          THE COURT:  Announce the case, please.

8          MR. MYGRANT:  Good morning, Your Honor.  Steve Mygrant

9   on behalf of the government.

10         This is the United States versus Kenneth Hause.  It's

11  3:18-cr-00319, Your Honor.

12         He's present.  He's in the custody of the United

13  States Marshals.  He's accompanied by counsel, Mr. Bofferding.

14         Also with me at counsel table on behalf of the

15  government is Rebecca Staton, a trial lawyer from the organized

16  crime gang section back in Washington DC.

17         We are here for a detention hearing, Your Honor.  The

18  government has submitted written memorandum representing our

19  request to detain the defendant pending trial.

20         We've also offered six exhibits which we have provided

21  copies to defense counsel and forwarded to Your Honor prior to

22  this hearing.  I would ask for purposes of this hearing, that

23  those exhibits be received.

24         We are prepared to proceed as soon as Your Honor is

25  ready to hear from the government.

1          Thank you.

2          THE COURT:  Thank you.

3          Counsel?

4          MR. BOFFERDING:  Yes, Your Honor.  Thank you very

5    much.

6          Your Honor, I have provided to the Court a ten-page

7    memorandum justifying all the reasons I believe Mr. Hause is

8    entitled to release.  I also submitted letters from community

9    members, Mr. Hause's medical records from the veterans

10   administration, and along with a letter, a cover letter, with

11   that.

12         What I'd like to talk about more than anything else

13   right now is the history and characteristics of Mr. Hause.  That

14   is the most critical part of a detention hearing from the part

15   of the defense.  We have not received nor reviewed any discovery

16   at all, so the only thing that I'm able to argue is why

17   Mr. Hause should be released based on his personal history and

18   characteristics.

19         Now, I'm not going to recite everything that I put in

20   my memo.  I'm just going to hit the main strong points, and the

21   first one is dealing with character.

22         The people that I spoke with in Aumsville, not just

23   his family, but other people, such as the chief of police of

24   Aumsville, all said the same thing, basically that he's a kind

25   man, they don't have problems with him, the Gypsy Jokers are not

1  running through his town.  The chief of police, I'm talking

2  about.

3          The chief of police has had many contacts with

4  Mr. Hause through the years.  At all times, he was peaceful.  At

5  no time was he causing trouble.  He was, in all effect, an ideal

6  citizen of Aumsville.

7          There are people ranging from waitresses to gas

8  station attendants to lawyers.  A lawyer, Paul Ferder, wrote a

9  letter.  He knows Mr. Hause very, very well.  He would be here,

10  but he's down south right now.

11          But what he did, he wrote a letter.  I gave it to the

12  Court.  He told me to tell you that Mr. Hause is a man of honor.

13  He's going to do what he says he's going to do.  If he says he's

14  going to be told to be released, go home, don't cause trouble,

15  don't make threats, don't leave your home except when you have

16  to for medical issues or to see me, that he will stay there.  He

17  will comply.  He will not be a danger, he will not be a harm to

18  anybody, Your Honor.

19          When you take a look at whether or not somebody is

20  going to comply on pretrial services, you need to look whether

21  or not the person has ever completed pretrial services

22  supervision before, and he has 20 years ago.

23          Your Honor was provided a copy of a judgment order

24  that showed that he was acquitted of distribution of drug

25  charges 20 years ago.  He was placed on pretrial services.  He

1  successfully completed.  He didn't have any violations.  He

2  showed up to all his court appearances.  He showed up to his

3  trial where, once again, he was acquitted.

4  If Your Honor tells him to do something, Mr. Hause

5  will do it.  He'll show up at all his court appearances, he'll

6  show up to his trial, and, most importantly, he's not going to

7  threaten anybody.  That would cut against every interest for

8  Mr. Hause.  That would result in him being thrown back in jail,

9  extra penalties if convicted.  There is no reason for him to do

10  that whatsoever.

11  The second issue I want to talk about is medical

12  condition.

13  I provided you the medical records.  And the medical

14  records has -- it talks about what the conditions are in quite

15  long words, medical words.  But when you get right down to it,

16  under layman's terms, he suffers from chronic congenital heart

17  failure.

18  He had a heart attack years ago and he was given a

19  pacemaker, and it's a condition that's going to kill him.  It's

20  just a matter of time, really.  We're hoping for ten more years.

21  We're hoping for medical advancements and things change and he's

22  given a longer life.  That could happen too.  But right now we

23  have to look at what's the focus.

24  THE COURT:  He's how old now?

25  MR. BOFFERDING:  He's 61.  He turns 62 in May.

1            THE COURT:  Go ahead.

2            MR. BOFFERDING:  And his issue with his heart, he has

3    an enlarged left ventricle which is caused by a disease that's

4    progressive and it causes his left ventricle to enlarge and

5    restricts the blood flow.  He has a pacemaker which is -- as

6    therapy that keeps his heart in rhythm.

7            But there are times when he has difficulties, where he

8    has symptoms of heart failure itself.  And in the medical

9    records that I provided to Your Honor, in December,

10    December 7th, I believe, he went and he saw his doctor, and he

11    complained of, I believe, dizziness, exhaustion.  He just wasn't

12    feeling good, feeling really rundown.  And, Your Honor, that is

13    symptomatic of heart failure.

14            Mr. Hause contacted me through his wife a couple of

15    days ago.  He said he was feeling numbness in his extremities

16    and he was feeling rundown.  He wasn't feeling very well.

17            What that means is that he's not able right now to

18    fully comply with what the doctors are telling him.  The doctors

19    gave him a protocol in December when they learned about his

20    increased fatigue and they are very concerned about heart

21    failure issues.  And so they put him on a protocol, and the

22    protocol includes taking your blood pressure every day.  Can't

23    do that in a jail.  Supposed to use a CPAP machine to keep you

24    from explosively snoring at night.

25            And the reason why that is -- there's two reasons for

1   a CPAP.  One is to keep your spouse comfortable so she sleeps

2   through the night, not waking her up all the time.

3              THE COURT:  Is she here today?

4              MR. BOFFERDING:  She is.

5              THE COURT:  Raise your hand.

6              Thank you.

7              MR. BOFFERDING:  And the second reason -- and I know

8   this because my wife has a CPAP machine as well -- when you have

9   an explosive snore, you're gasping for breath.  What happens is

10  you just stop breathing and you wake yourself up because you're

11  not breathing and you snore explosively.

12             Those episodes are very traumatic on the heart.  It's

13  important that you have a CPAP machine that you use every night

14  to keep your heart from going out when something like that

15  happens.

16             Now, when you're in a jail -- he has a CPAP machine in

17  his jail, but I know personally you have to clean those things.

18  There's long tubes, there's a face mask that goes into the

19  machine.  Those tubes have to be cleaned out with scalding hot

20  water regularly.  You cannot do that in the jail.  It actually

21  is worse when it's not cleaned out because bacteria builds up

22  and you can get really sick.

23             He has four separate medications that he needs to

24  take.  According to Mr. Hause, he is not receiving all of them.

25  I have been getting mixed answers from the marshals and the

1  jail.  I only know what my client tells me, and what he tells me

2  is he's not getting all his medications regularly.  There's four

3  different ones.  He's getting one regularly, but the other

4  three --

5          THE COURT:  Did he tell you that he refused

6  medication?

7          MR. BOFFERDING:  The reason for that, Your Honor,

8  is --

9          THE COURT:  Did he tell you that?

10          MR. BOFFERDING:  He has.  No, he did.  That's what

11  Columbia County told me.

12          Now, I've had that happen before.  When you're in

13  medical at Columbia County, my understanding is that they put

14  you in essentially isolation.  You're isolated there with no

15  other human contact.  It's very debilitating.  It's not the

16  cleanest place in the world.  And when one of my clients, once

17  again --

18          THE COURT:  The question was quite simple.  Did he

19  refuse to take his medications?

20          MR. BOFFERDING:  He asked to be --

21          THE COURT:  Yes or no.

22          MR. BOFFERDING:  I would say no because he asked to be

23  moved to general population and they took that as a refusal.

24  I've had them tell me before on other clients when they said I

25  can't stay in isolation, get me in general population.  But he

1   wasn't saying I'm not taking my meds.  He's saying I don't want

2   to be in isolation.  So it's a yes and no.

3          THE COURT:  Go ahead.

4          MR. BOFFERDING:  The other protocols that he's been

5   placed on is having a no-salt diet, keep regular medical

6   appointments to check his pacemaker and his heart.  The last

7   appointment that he had scheduled he missed because he was

8   incarcerated.  One was two days after he was arrested and then

9   another one was just a few days ago, last Friday, I believe.

10  Those need to be rescheduled.  And I believe he has appointments

11  set every two months.

12         The next thing I want to talk about is past criminal

13  conduct.

14         He does have a criminal history.  Absolutely, he does.

15  But every single one of those acts are very dated.  They're very

16  old.  There's nothing even recent to indicate that Mr. Hause is

17  now the person that the government believes he is and was.  He's

18  just not.

19         His last court sentence -- I believe it was for

20  violation of supervision -- was August 6th of 2003.  That's

21  15 years ago, Your Honor.

22         According to the superseding indictment -- and once

23  again, I haven't seen any discovery -- the last overt or

24  predicate act involved in the racketeering count of count 1 is

25  December of 2012.  Your Honor, that's over six years ago.  That

1    was before the time of his heart problems starting, which means

2    that his life has changed dramatically and the way -- what

3    Mr. Hause has focused on has changed significantly.

4              Right now he has deep family and community ties with

5    Aumsville.  His focus is now on his wife of 36 years, on his

6    kids and his many grandkids.  His grandchildren are his life.

7    His day, he wakes up, he goes and visits the grandkids before

8    they go to school.  Then he goes to the bus stop.  This is every

9    day.  The kids come home, get off the bus, he welcomes them.  He

10    takes -- he shoots basketball hoops with one of his grandkids.

11    He's really, really involved in the family, and that is his

12    focus.

13              I believe that Mr. Hause is a very good release

14    candidate for home confinement and location monitoring.  I don't

15    believe he's now the man that the government believes he is, and

16    his past many years of lawful conduct is the best indicator that

17    he'll comply with conditions of supervision.

18              Now, three other things I want to talk about that

19    basically directly rebut, in my mind, what the government is

20    going to claim.

21              They're going to claim that somehow Mr. Hause was

22    involved in the kidnapping and murder of the victim in the

23    indictment.  There's no evidence to indicate that at all.  There

24    is a phone call allegedly from defendant No. 1 to Mr. Hause

25    prior to when all the alleged mayhem started, but there's no

1   evidence at all to indicate that defendant 1 was asking

2   Mr. Hause for permission to order a murder.

3           There's no information at all to suggest that

4   Mr. Hause ordered a murder.  In fact, Mr. Hause's wife was

5   present in the room with the conversation and heard the other

6   side, heard Mr. Hause.  At no time did he order a hit.  It was

7   just all moral support, comforting a good friend whose wife had

8   just been traumatized.  That's perfectly natural.  It's not

9   unordinary.  And for the government to make a leap that that

10  just must mean Mr. Hause ordered a hit, essentially, is

11  misplaced.  It's a leap of evidence.  It's not sufficiently

12  relevant to whether or not he is a threat to anybody.

13          The government is also going to make mention of some

14  money.  About $35,000 was placed in my client's bank account

15  back in 2017.  The only indication that I could assume is the

16  government's alleging that that's monies derived from illicit

17  activity.  But it wasn't.

18          According to the family, 2017, Mr. Hause's mother

19  passed way.  He received an inheritance of a little over

20  $35,000.

21          The government is then going to indicate that a few

22  days later there was a 5,000, $10,000 withdrawal.  I'm not sure

23  what they think that means.  What it means from our side is -- I

24  talked to his kids.  No, that was money from the inheritance

25  that Mr. Hause gave his children.  He didn't keep it all for

1    himself, he passed it down, because that's what his main focus

2    is, is his family.

3          The last thing the government is going to talk about,

4    I believe, is there's a list of duties of the national president

5    of the motorcycle club.  And those duties all look to be at a

6    macro level.  It's organizational.  It's not day-to-day

7    activities.  It's not ordering a murder.  It's not ordering a

8    kidnapping.  It's just organization.  It's -- it's not the micro

9    level which would be somebody else's responsibility but not

10   Mr. Hause's.

11         For those reasons, I'm requesting release with home

12   confinement, with GPS monitoring.

13         THE COURT:  Thank you.

14         MR. BOFFERDING:  Thank you, Your Honor.

15         THE COURT:  Counsel?

16         MR. MYGRANT:  Thank you, Your Honor.

17         This is obviously a very serious matter, from the

18   government's perspective.  These charges were not brought

19   lightly.  This is the product of a multiyear investigation.

20         THE COURT:  Well, let's get on the record what he is

21   charged with and what the others are charged with.

22         MR. MYGRANT:  Certainly, Your Honor.

23         He is personally charged with a racketeering

24   conspiracy.  That racketeering conspiracy is also to be alleged

25   with his other co-defendants in this case.

1            There are five other co-defendants that have appeared

2    before magistrate judges in this district.  They have also

3    appeared on charges relating to murder and kidnapping and VICAR,

4    which is violence in the commission of aid of racketeering

5    related charges.  Mr. Hause is not charged in those substantive

6    counts.  He is charged --

7            THE COURT:  He's not charged with murder, torture?

8            MR. MYGRANT:  Or kidnapping.

9            THE COURT:  Kidnapping.

10            MR. MYGRANT:  Not charged for those specific

11    substantive offenses.

12            THE COURT:  Thank you.

13            MR. MYGRANT:  However, he is charged to be involved in

14    a conspiracy with those co-defendants who did carry out that

15    kidnapping, that murder of Mr. Huggins, as well as significant

16    witness intimidation and assaults, some at the hands of

17    Mr. Hause and some at his orders.

18            So we have commenced a lengthy investigation that has

19    gone over two years.  This doesn't -- this charge is not brought

20    just by our office.  It's in consultation with the organized

21    crime gang section.  And Mr. Hause ultimately is charged in that

22    single count.

23            Procedurally, each of these other defendants have

24    appeared at magistrate court.  They have been detained as flight

25    risks and as danger to the community given the homicide that

1    occurred, the witness intimidation that's occurred in this case,

2    and the assaults that have occurred in this case.

3            This is a presumption case, Your Honor, as I know

4    you're well aware, and I believe that that's where we should

5    start from.

6            It is presumed, given the 20-year sentence that he is

7    facing on this racketeering conspiracy, that he be detained.

8    And we do believe that he is a danger to the community and that

9    he is also a flight risk, and I'll go into those reasons in more

10   detail momentarily.

11           In terms of this racketeering conspiracy, Your Honor,

12   it's clear, it's un-rebutted that the defendant is the national

13   president of this violent outlaw motorcycle gang.  Period.  End

14   of story.

15           The Gypsy Jokers control Oregon from an outlaw

16   motorcycle gang perspective.  They don't have a lot of

17   competition in Oregon because of a long history of them

18   enforcing their club through violence and threats and witness

19   intimidation and murder.

20           This defendant is the lead defendant of this criminal

21   organization.  They have multiple clubhouses here in the state.

22   They have an international presence in Germany, in Australia,

23   and the state of Washington and elsewhere.

24           This investigation really began with the murder of

25   Mr. Huggins.  I've outlined in the sentencing memo the history

1  of that case.  I won't repeat all of it, but there are a few

2  important details that bear repeating.

3          Mr. Huggins was a member of the organization in which

4  Mr. Hause was in control of.  Mr. Huggins was removed from the

5  organization after intravenous drug use and stealing club funds.

6  Mr. Huggins then engaged in criminal activity of his own

7  involving one of the co-defendants in this case when he

8  committed a robbery of one of the victims.

9          THE COURT:  Robbery or burglary?

10          MR. MYGRANT:  It was a robbery and a burglary and a

11  kidnapping at Mr. Dencklau's residence in which his then

12  girlfriend was tied up and this robbery, burglary, kidnapping

13  did occur.

14          THE COURT:  Yes.

15          MR. MYGRANT:  Undisputed.

16          What happened from there is what really triggered this

17  investigation.  Mr. Dencklau returned to his residence in

18  Woodburn where the first -- after he talked to his girlfriend at

19  the time, the very first call he made was to Mr. Hause.

20          Mr. Hause acknowledges that, that he had that phone

21  call with him.  Mr. Hause subsequently went to Mr. Dencklau's

22  house and they had a consultation.

23          I can tell the Court that for the next 25 days it was

24  a manhunt for Mr. Huggins.  This organization had a hit out for

25  Bobby Huggins, and the principal shot caller of his organization

1  is the defendant here in the courtroom today.

2         Mr. Huggins lasted 25 days.  He ultimately was

3  abducted by about a half dozen of these guys, all members or

4  associates, support club members of the Gypsy Jokers.  They

5  kidnapped him, they brutally beat him, they tortured him, and

6  they dumped his body after several hours of torture in southwest

7  Washington and left him to die.

8         His tattoos that he had showing allegiance to the

9  organization were x'd out.  This was a gruesome brutal murder

10 that occurred at the hands of this criminal enterprise.

11        The defendant is in fact the de facto CEO of this

12 organization, of this enterprise.  And that "CEO" really could

13 stand for chief enforcement officer.

14        If the Court has the ability to look at Government

15 Exhibit 1, which I've offered to the Court, one of his -- he has

16 several different duties as the wizard of the Gypsy Jokers.

17 "The bull stops here," Government Exhibit 1 says.  He is to

18 enforce USA business.  He is to work closely with all --

19        THE COURT:  "USA" standing for what?

20        MR. MYGRANT:  United States of America for the Gypsy

21 Jokers in which he is the national president.

22        THE COURT:  To enforce -- again?

23        MR. MYGRANT:  Enforce United States business with

24 presidents, assuming there's presidents in Norway, there's

25 presidents in Australia, and the international component to this

1    criminal enterprise.

2           He also --

3           THE COURT:  Well, I'm not following the connect.

4           MR. MYGRANT:  He's an enforcer.  USA is Gypsy Jokers'

5    acronym for this particular enterprise, this national enterprise

6    in the United States of America.

7           THE COURT:  All right.  I see what -- okay.  I follow

8    you.  Go ahead.

9           MR. MYGRANT:  He also -- one of the rules, No. 8, is

10   to put all the fingers in a glove to make a fist.  That, again,

11   goes inline with the theory of the government's case, that

12   Mr. Hause is the top dog.  He is the big guy.  He is the chief

13   enforcement officer of this criminal enterprise.

14          It's a 1 percent motorcycle club, Your Honor.  They

15   take pride in that 1 percent.  That means that

16   they -- 99 percent of motorcycle riders in the world are

17   law-abiding citizens.  They are the 1 percent in which they take

18   pride in which they are not law-abiding citizens.  They don't

19   follow the rules, and yet what's being asked and proposed here

20   is to outline a list of rules that he's to comply with of

21   conditions of release.

22          His identity for the last 30 years has been to go

23   against the rules, to be part of that 1 percent.  This is a

24   highly organized top-down model of an enterprise.

25          I can tell the Court that his criminal history, I

1   don't dispute that he has nothing in the criminal history

2   worksheet since 2005.  From 1980s until 2005, I think it's worth

3   talking through those and I would like the opportunity to do

4   that.

5            In 1998 he had a misdemeanor assault in which he was

6   convicted in Stayton.  Your Honor, there were three probation

7   violations that occurred from that assault 4.  That probation

8   was ultimately revoked and a full year of custody was imposed

9   following his unsuccessful supervision.

10           In 1999, he was convicted of a felony assault 4

11  involving domestic violence of his wife.  There were multiple

12  violations resulting in the revocation --

13           THE COURT:  Of his present wife?

14           MR. MYGRANT:  That's my understanding, Your Honor.

15           And that was four months of Department of Corrections

16  after it was -- he ultimately -- he got a probation case up

17  front.  That was revoked after multiple violations.  He was -- a

18  four-month sentence, DOC sentence was imposed with 12 months of

19  post-prison supervision.

20           While on post-prison supervision he was violated

21  for -- and sanctioned for associating with Gypsy Jokers, using

22  methamphetamine, and having contact with his wife.

23           Again, somebody that's asking to be released proved to

24  be unsupervisable when he was on probation in Marion County and

25  on post-prison supervision.

1    He was convicted again in 2002 for felon in possession

2  of a firearm, Your Honor.  He received a probationary sentence

3  again.  That too was revoked.

4    He served 13 months in the Department of Corrections.

5  And then I think this is important.  While on post-prison

6  supervision, he was sanctioned multiple times.  In January of

7  '04, he was sanctioned for associating with Gypsy Jokers.  In

8  December of '04 he was sanctioned for use of methamphetamine and

9  being untruthful to his supervising parole officer.

10    In January '05, sanction for meth use.  May of '05,

11  sanction for meth use.  September of '05, sanction for meth use.

12  October of '05, sanction for meth use.

13    This is somebody who is again asking to be released

14  into the community to follow rules, yet his history shows that

15  he does not conform with conditions of probation and

16  supervision.

17    I understand that his criminal conviction -- he

18  doesn't have criminal convictions after 2005.  However, as part

19  of the government's investigation, Your Honor, we have outlined

20  in the indictment, superseding indictment, with excruciating

21  detail several acts of criminal behavior that continued right

22  after the defendant was released from supervision and continuing

23  on, and I would like an opportunity to briefly go over those

24  overt acts.

25    In September of 2008, Mr. Hause is alleged in the

1  superseding indictment to have punched out an Oregon Veteran

2  Motorcycle Association member and knocked his teeth out.

3  Mr. Hause then warned that member he had 30 days to shut down

4  that support club to the Gypsy Jokers.  Following that assault,

5  the allegation is that Mr. Hause threatened to kill any OVMA

6  member who told of the assault.

7            THE COURT:  Which stands for what?

8            MR. MYGRANT:  Oregon Veterans Motorcycle Association,

9  which is a support club to the Gypsy Jokers.

10           MS. STATON:  It's not a support club.

11           MR. MYGRANT:  I stand corrected.  Oregon Veterans

12  Motorcycle Association.

13           THE COURT:  Thank you.

14           MR. MYGRANT:  Your Honor, in January of '09, multiple

15  members of the Gypsy Jokers assaulted another Oregon Veteran

16  Motorcycle Association member for failing to follow Mr. Hause's

17  order.

18           In July of '09, Mr. Hause and his co-defendant in this

19  case, Mr. Dencklau, instructed OVMA members to remove a patch.

20  Dencklau then assaulted that member.

21           September of '12, evidence showed in this

22  investigation that Mr. Hause ordered a Gypsy Joker to assault

23  another Gypsy Joker club member.  In September of 2012 Hause

24  assaulted a Gypsy Joker member, knocked him unconscious with a

25  sap.

1       September of 2012, Mr. Hause punched and stomped a

2  Gypsy Joker member in the head knocking out several teeth.  In

3  September of 2012, Mr. Hause threatened to kill another Gypsy

4  Joker club member if he didn't surrender his motorcycle.

5       There are multiple instances in this superseding

6  indictment in which the defendant's engaged in the distribution

7  of methamphetamine.

8       This criminal activity did not stop following his

9  supervision, Your Honor.  This criminal activity kept on going.

10  The reason that it didn't result in convictions is because they

11  have built fear in the community, that anybody that reports this

12  criminal behavior will pay the consequences.  And so Mr. Hause,

13  in his position of authority, has been protected.

14       And now we want to release -- now the recommendation

15  from defense is to release him back in the community.  There are

16  multiple instances in this investigation, Your Honor, in which

17  witnesses have been tampered with or attempted to be tampered

18  with.  We have had to take extraordinary steps to try to protect

19  these individuals, including moving multiple people out of

20  state, and we are attending to that almost on a daily basis.

21       Mr. Hause does have international ties to this

22  enterprise.

23       THE COURT:  Would you repeat that sentence?  The

24  beginning of that last sentence.

25       MR. MYGRANT:  Mr. Hause has international ties?  Or

1   going back one before that?

2          We are -- there are multiple witnesses that we have

3   had to take proactive steps, meaning the government has had to

4   take proactive steps, to move out of state because of safety

5   concerns.

6          THE COURT:  Talking about currently?

7          MR. MYGRANT:  Currently.

8          THE COURT:  Yes.

9          MR. MYGRANT:  This -- Mr. Hause does have

10  international ties.  This Gypsy Jokers outlaw motorcycle club

11  has ties in Norway, it has ties in Germany, and there are other

12  chapters throughout the United States too.

13         I refer the Court to Government 4, Government

14  Exhibit 4 and 5 and 6 which show the international nature of

15  this organization.  There is a photograph of the Gypsy Jokers

16  Norway chapter.  There is a photograph in Exhibit 5 in which

17  Mr. Hause is pictured with multiple members from this

18  international organization.

19         This is purely to demonstrate the international ties

20  that he and his outlaw motorcycle club have to the world.

21  Government No. 6 shows the Australian chapter, the clubhouse in

22  Sidney, and its presence and his access to those people.

23         I also provided to the Court and to defense counsel in

24  Government's Exhibits 2 and 3 two financial statements which

25  show large deposits of $35,000; in Government Exhibit 3, a

1    deposit that was made in 2017, as well as some other --

2            THE COURT:  Did you have an opportunity to examine the

3    validity of his claim that this was an inheritance?

4            MR. MYGRANT:  I have not, Your Honor.  We obtained

5    that information today.

6            THE COURT:  I'm sure you will.

7            MR. MYGRANT:  We will follow through on that.

8            THE COURT:  Go ahead.

9            MR. MYGRANT:  Your Honor, just about to wrap up here.

10   But in terms of the --

11           THE COURT:  We're in no hurry.

12           MR. MYGRANT:  Thank you.

13         In terms of the medical situation, I've personally

14   consulted with the deputy marshals and Deputy Sanchez.  It's my

15   understanding that the defendant did refuse medical treatment,

16   that -- for his heart medication, that the Columbia County jail

17   is taking every step to make sure that he is able to take his

18   heart medication, that they are taking the situation seriously,

19   and we will do everything we can to ensure that his health is

20   protected.  And I believe that the marshal service and the

21   Columbia County jail are taking those important steps.

22         In closing, Your Honor, I just want to hit on a few

23   important points.

24         It's really un-refuted that he is the head of this

25   criminal enterprise.  Multiple members of this criminal

enterprise committed a murder, according to the superseding

indictment and we intend to prove at trial.

This is a 1 percent outlaw motorcycle club.

THE COURT:  For the record, who are you claiming did

the torture and murder?

MR. MYGRANT:  Well, the indictment alleges that

Mr. Dencklau, Mr. Pribbernow, Mr. Erickson, Mr. Fisher,

Mr. Negrinelli, and others.  And Mr. Folkerts is the last one.

And there may be -- there may be more to come, Your Honor.

I can tell the Court that it goes beyond just this

murder.  There is a pattern here of enforcement, of

intimidation, of threats, of assaults, to further the influence

of this criminal enterprise.

They take pride in that 1 percent notation of being

a -- you know, the 1 percent that doesn't follow the rules, yet

the irony is they want to convince the Court that they will

follow all the rules that would be imposed if pretrial was to be

given.

He does have this past history.  It is not a good past

history of supervision.  It's repeated failures.

It's the government's position that release -- the

defense has not overcome the presumption.  The presumption of

danger and flight risk apply.  The defendant has access to funds

as is listed in the pretrial services report.  He has access to

properties that are owned.  He has international ties.  He is a

flight risk, from the government's perspective, and the defense

has not overcome for presumption that he is.

Additionally, we believe he is a danger to the

community.  He may not be the person that goes out and

personally intimidates witnesses or personally assaults

witnesses, but he has the ability to influence others who can,

and that is a risk that is not worth taking, from our

perspective.

When the defendant was interviewed by the ATF and

Portland Police Bureau in his post-arrest interview, he

indicated that he knew what he signed up for, and he signed up

to be part of a criminal enterprise that has engaged in all of

this criminal behavior that I have outlined extensively for the

Court here this morning.

I would ask the Court to follow the presumption and

detain Mr. Hause pending trial.

Thank you.

THE COURT:  Thank you.

MR. BOFFERDING:  May I respond?

THE COURT:  Do you wish to add anything?

MR. BOFFERDING:  I do, I do.

THE COURT:  No, no.  Excuse me.

I'm talking to your associate from DC.

Go ahead.

MS. STATON:  Thank you, Your Honor.

 1          A couple of things I would add to -- Mr. Mygrant has

 2    covered it sufficiently and thoroughly.

 3          But I think Your Honor knows just this basic idea that

 4    Mr. Hause, while not charged with these substantive counts,

 5    Mr. House is charged with RICO conspiracy, and that means that

 6    Mr. Hause, as the national leader of this enterprise, is charged

 7    with agreeing that he or someone else would commit two

 8    racketeering acts.  The racketeering acts alleged in this

 9    indictment, as you know, Your Honor, are murder, kidnapping,

10    extortion, robbery, and witness tampering with him at the head.

11          Documents taken from his home during the takedown,

12    January 30th, just a couple of weeks ago, lay out his role.  He

13    is the wiz.  The bull stops here.  This is government's

14    Exhibit 1.  He is to enforce USA, which we know to be through

15    this investigation, Gypsy Jokers, to enforce USA business with

16    the presidents.

17          That's what that phone call was.  When he went to Mark

18    Dencklau's house just after he was robbed, a month later, Bobby

19    Huggins was dead.

20          Your Honor, I know that you've heard a lot of

21    evidence.  We are very concerned about the safety of witnesses

22    in this case.  Very concerned.  There are specific allegations

23    of witness tampering in this indictment.  And as Mr. Mygrant

24    pointed out, we have moved several individuals already out of

25    safety concerns and we are very concerned about the

1   dangerousness of this defendant.

2          We also know very well that he is a flight risk.  That

3   calendar referenced in Government's Exhibits 4 and 5 are from

4   2015.  That's recent, Your Honor.  That's a Norway calendar, a

5   Gypsy Joker calendar from Norway that this defendant had at his

6   house two weeks ago, that he has in his possession.

7          And guess what?  His picture is in it.  He is in a

8   calendar from Norway -- Norway -- with representatives of the

9   Gypsy Jokers.  He's in that photo with representatives from

10  Gypsy Joker Australia, Gypsy Joker Germany, Gypsy Joker -- Gypsy

11  Joker Norway.  All of those individuals are in the same photo

12  that he's in, and he's the president.

13         All of these things taken together, Your Honor, I hope

14  that you'll consider them.

15         I know that pretrial is not able to consider the

16  nature of the evidence, the strength of the evidence against

17  this client but -- against this defendant, but this Court is,

18  and we hope that you will.

19         THE COURT:  Thank you.

20         MS. STATON:  Thank you.

21         THE COURT:  Response?

22         MR. BOFFERDING:  Yes, Your Honor.  I have four

23  responses to make.  First of all has to do with the medication

24  issue.

25         Mr. Hause told me that there was a time not too long

1    ago he was at Columbia County.  They tried to administer him his

2    gout medication in the evening.  He refused.  No, I need that

3    pill in the morning.  They took that as a flat refusal.

4          And again, that's not out of the ordinary with

5    Columbia County and how they deal with my clients on medical

6    issues.

7          The Norway calendar, we assume it's a Norway calendar.

8    It's a calendar.  We don't know who made it.  We don't know

9    where the pictures were taken.  It just shows up on a calendar.

10   It's not evidence that he was anywhere at any particular point

11   in time.  It's a photograph that was taken.  Somebody took a

12   photograph and they printed up some calendars with it.  It

13   doesn't indicate that he was in Norway 2015, 2005, 1987.  It

14   doesn't.

15         The government -- the third thing I want to talk about

16   is, the government is right, burden of proof to show that

17   he's -- clear and convincing evidence that -- of flight risk or

18   a danger, and preponderance of the evidence of a flight risk.

19   We acknowledge that, and we felt the defense has met its burden.

20         However, one thing that seems to have been lost on the

21   government, they have a burden too.  It's called the burden of

22   persuasion.  They have to persuade the Court that Mr. Hause is a

23   danger.  They haven't done that.  They made leaps on innuendos,

24   two people at the same place or two people on the phone at the

25   same time.  That doesn't mean anything.  That's not evidence.

1    That's why we're here.  They have not persuaded the Court, my

2    argument, that he is at all a danger.

3            When Counsel suggests there was a phone call and order

4    to a murder because he's the CEO, allegedly, she says that's

5    what the telephone call was about.  Well, she doesn't know that.

6    She's guessing.

7            Well, we know from my conversation with his wife Kelly

8    that's not what that conversation was about, a hit.  Oh, my

9    gosh, your wife got tied up, that's horrible, that's what it was

10   about.  It was a comfort issue.  It wasn't about setting up a

11   hit.

12           May I just have a moment?

13           You know, the last thing I want to talk about is

14   issues of threats in general with people who are in custody.

15           We get cases from time to time where a person is in

16   custody and they're charged with witness tampering.  I've had

17   that happen.

18           I actually went to trial a year and a half ago on a

19   case exactly like that, and what I learned from that case is

20   that if somebody who's locked up wants somebody outside to be

21   threatened, it's actually really easy to do.  You don't have to

22   use a phone, you don't have to write a message to anybody.  All

23   you have to do is find somebody that's in jail who's getting out

24   soon, offer them a little bit of commissary, a couple of candy

25   bars, some money when they get out, maybe even drugs when they

1  get out or when they're in.  Pass this message along for me.

2  Okay, you got it.

3          That's how you do it, there is no evidence, nobody

4  knows, which means that the government's argument that Mr. Hause

5  needs to be locked up to prevent threats against any witnesses

6  rings hollow.  There's no connection, there's -- no realistic

7  argument can be made that a person in jail or out of jail cannot

8  make a similar threat.

9          For that reason, the government has failed its burden

10 of persuasion.

11         Thank you, Your Honor.

12         THE COURT:  Thank you.

13         As I understand, for pretrial services, you're

14 recommending release, but you cannot pass on the danger.  Is

15 that correct?

16         MS. CUBIAS:  Your Honor, what the government indicated

17 in stating that we're unable to consider the weight of the

18 evidence, that is true.  But we do --

19         THE COURT:  Again, will you please speak up and bring

20 the mic towards you.

21         MS. CUBIAS:  We do think that there are conditions

22 that are enforceable to ensure that there is safety within the

23 community.  We do not believe that Mr. Hause is a flight risk.

24         Does that answer the Judge's question?

25         THE COURT:  And your bottom-line recommendation?

1          MS. CUBIAS:  Release.

2          THE COURT:  Thank you.

3          In respect to this matter, without revealing an

4    identity of anybody, do you have a witness who will testify that

5    this defendant, not circumstantially, but directly ordered the

6    murder, the torture murder?

7          MR. MYGRANT:  We can represent that we do not have

8    that proffered testimony at this time, Your Honor.

9          THE COURT:  You do not?

10         MR. MYGRANT:  That's correct.

11         THE COURT:  Thank you.

12         Well, without direct evidence, then there -- I have

13   dealt with motorcycle people for the last at least 40 years,

14   including the Outsiders, Gypsy Jokers, you name it.

15         There's no doubt that the defendant is the head guy,

16   but there also at this point is limited evidence of his ordering

17   the murders and torture murders of this former member of the

18   group.

19         There's no question that on a conspiracy theory, that

20   he can be held responsible for certain acts of the group if they

21   can be proven beyond a reasonable doubt.

22         There's no question in this case that he has stability

23   in his neighborhood, that he owns a home, he runs a business.

24   He has medical care issues, which I find have been adequately

25   managed in jail, but that are better managed, you

know -- locality, a local situation.  He has a stable marriage.
He is not a flight risk.

He is not -- at this point, I agree with Counsel.  If
someone wants -- is in jail and they've been in charge of an
organization or if they want to solicit somebody else to do it,
it can be done easily.  It can be done in jail just as well as
it can be done out of jail.  It's -- we know well -- well know
that such matters have been ordered and completed from an
in-custody situation.

Without the potential of direct proof of his order,
it's not enough to retain him at this juncture.

This is also tempered by the fact that this is complex
litigation.  I've been advised by one of your associates,
Counsel, that you're talking about asking for a year from now
for trial.  Is that correct?

MR. MYGRANT:  I believe that's accurate, Your Honor.

THE COURT:  So to have him sitting in a county jail
for a year with things percolating is another reason that he has
not been proven beyond a reasonable doubt to be in custody at
this juncture.

There's no doubt in my mind that he is capable of
these acts, and that they may or may not be proven in trial.

I suggest however -- I'm well aware of the people that
you have lined up to testify who are unknown and their locations
are unknown, and we hope that that will continue to be the case.

1          But if -- this case should be ripe for trial.  It

2   shouldn't be a year.  They're available now.  We have everything

3   known about this case now.  You should be prepared to go to

4   trial within six months, and I'm going to hold you to that.

5          The defendant will be released, but under home

6   detention.  That means complete home detention.  No association

7   via phone, land phone, cell phone, any form of communication

8   with any member of the Gypsy Jokers, immediate resignation of

9   any association in that group, no association with any member of

10  that group.  None.

11         The minute I get word that you're communicating or

12  attempting to communicate with your fellow members, which are

13  extensive -- your phone will be monitored.  You'll be

14  under -- you'll have a tracking device to track your -- where

15  you do go.

16         But what I'm saying to you is you're going to

17  be -- instead of jail, you'll be at home at Aumsville.

18         That's where your home is?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  And no place else except to go to the

21  doctor.  No other exceptions without direct approval of me, not

22  just the approval of your probation officer or your supervised

23  release officer or your pretrial officer.

24         Now, I want to have -- are you through?

25         MS. STATON:  I'm sorry, Your Honor.

```
1              THE COURT:  Are there specific restrictions that the
2    government wants in view of this ruling?
3              MR. MYGRANT:  We're concerned about third-party
4    contact as well with other members of this organization.  So
5    whether his wife communicates on his behalf to others -- we
6    would consider that to be a violation.
7              THE COURT:  There will be no communication by any
8    member of the family.  You're totally isolated from the members,
9    former members of the Gypsy Jokers in any form.
10             Anything further?
11             MS. STATON:  Just for clarification, Your Honor.
12             When you say members, former members, does that also
13   include Gypsy Joker associates, people affiliated who may not be
14   members, and, additionally, support club members, which are
15   outlined in the superseding indictment?
16             THE COURT:  That includes anybody with any attachment
17   or association with the organization.
18             MS. STATON:  Thank you.
19             THE COURT:  In other words, we want -- the moment that
20   we hear of anything that violates any aspect of this, you'll be
21   hauled in and confined until trial.
22             Anything further?
23             MR. MYGRANT:  No, Your Honor.  Thank you.
24             THE COURT:  For the defense?
25             MR. BOFFERDING:  No, Your Honor.  Thank you very much.
```

1          MS. CUBIAS:  Your Honor, you spoke of having the

2    defendant's phone monitored.  We are able to monitor internet

3    activity, but we cannot monitor conversations.

4          THE COURT:  Do the best you can.

5          MS. CUBIAS:  Okay.

6          THE COURT:  Thank you.

7          Court is in recess.

8

9       (The proceedings concluded at 12:24 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3            I certify, by signing below, that the foregoing is a

4    true and correct transcript of the record, taken by stenographic

5    means, of the proceedings in the above-titled cause.  A

6    transcript without an original signature, conformed signature,

7    or digitally signed signature is not certified.

8

9            DATED this 28th day of February, 2019.

10

11

12                                    // Ryan White
                                      _____
13                                    RYAN WHITE
                                      Registered Merit Reporter
                                      Certified Realtime Reporter
14                                    Expires 9/30/2019
                                      Washington CCR No. 3220
15                                    Expires 10/25/2019
                                      Oregon CSR No. 10-0419
16                                    Expires 12/31/2020

17

18

19

20

21

22

23

24

25